IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

DONALD R. SCOTT and
MELISSA J. SCOTT,

      Plaintiffs,

v.                                                Civil Action No. 3:10-cv-24

GMAC MORTGAGE, LLC,

      Defendant.

## DEFENDANT GMAC MORTGAGE, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE PHIL D'ORONZIO AS AN EXPERT WITNESS AND TO STRIKE PHIL D'ORONZIO'S EXPERT REPORTS

Defendant GMAC Mortgage, LLC ("GMAC"), by counsel, submits this memorandum in support of its motion to exclude the testimony of Phil d'Oronzio ("d'Oronzio"), Plaintiffs Donald R. Scott's and Melissa J. Scott's purported expert witness, and to strike d'Oronzio's expert reports.

## I.    INTRODUCTION

Plaintiffs assert fraud against GMAC and allege that GMAC intentionally concealed the presence of lender paid mortgage insurance (the "LPMI") on Plaintiffs' Loan. In support of liability and damages for their fraud claim, Plaintiffs offer the testimony of a purported expert Phil d'Oronzio. However, the February 15 deposition of d'Oronzio and his expert disclosures are irredeemably flawed by improper communications, inherent biases, raw speculation, and legal conclusions. As discussed below, d'Oronzio should be excluded and his reports should be stricken for the following reasons:

- d'Oronzio sought assistance from Jason Crigler, the son of Judge B. Waugh Crigler. d'Oronzio did so with full knowledge that Jason Crigler was the son of Judge Crigler and that this case was pending before Judge Criger, in an apparent attempt to bolster his own credibility in front of the jury at trial.

1

- d'Oronzio's improper contact with Jason Crigler may prejudice GMAC at trial when this issue arises during cross-examination of d'Oronzio regarding the bases of his expert opinion.

- d'Oronzio's inferences of fraudulent intent by GMAC's loan officer Karen Morris are tainted by his negative opinion about Morris, which, according to d'Oronzio's own admissions, he formed before he was retained as an expert in this case.

- d'Oronzio is not qualified to offer an expert opinion on damages either by his experience or his education. d'Oronzio holds bachelor's and master's degrees in history and has no education in mathematics, finance, or economics. His methods of calculating damages are speculative and without any scientific basis.

- d'Oronzio's expert reports are replete with impermissible legal conclusions about the intent to deceive, which is an element of the Plaintiff's fraud claim. d'Oronzio draws these conclusions without any scientific basis, using his subjective beliefs and conjectures, and admits that there may be many other reasons to account for the omission of LPMI references in Plaintiffs' Loan.

- d'Oronzio is not qualified to opine about the intentionality of purported omissions in the loan documents because he has no knowledge of or experience with software systems used at GMAC to generate loan documents.

- d'Oronzio submitted his supplemental expert report long after the written discovery deadline and only one day before his deposition. This untimely submission has prejudiced GMAC's ability to adequately depose d'Oronzio and prepare for trial.

## II.     ARGUMENT

A. **d'Oronzio Improperly Sought and Received Assistance from Judge Crigler's Son, Jason Crigler, to Prepare His Supplemental Expert Report.**

d'Oronzio's improper contact with Jason Crigler and the use of the mortgage data provided by Jason Crigler as the basis for the Supplemental Expert Report is likely to prejudice GMAC at trial by improperly bolstering d'Oronzio's credibility before the jury.[1]   Further,

---

[1] By letter dated February 21, 2011, GMAC's counsel informed Judge Crigler of d'Oronzio's improper contact with his son. (Docket No. 79). During the telephonic conference with Judge Crigler on February 24, 2011, GMAC notified the Court of its intent to file this motion to exclude Plaintiff's expert based on his improper contact with Jason Crigler.

d'Oronzio's use of Mr. Crigler's data hinders GMAC's ability to cross-examine d'Oronzio about the bases for his opinion at the risk of provoking jury's bias in favor of Plaintiffs. At the same time, GMAC's counsel's duty to protect its client's interests requires zealous and effective cross-examination of an adverse expert witness on such material issue as the basis for his expert opinion.

In his Supplemental Report, d'Oronzio concludes that the interest rate of 6.875% in the Plaintiffs' Loan was higher than the prevailing interest rate at the time of the Loan origination and incorporates this price differential in the calculation of Plaintiffs' damages. (Suppl. Expert Report at ¶¶ 2, 5(b), attached as Exhibit 1 hereto). d'Oronzio bases this conclusion on the review of the 2007 interest rate sheets from other lenders. (*Id.*) When asked where he obtained these rate sheets, d'Oronzio disclosed that he received some of them from Jason Crigler, the son of Judge Crigler. (d'Oronzio Dep. at 121-22, attached as Exhibit 2 hereto). d'Oronzio admitted that at the time he sought Jason Crigler's assistance in preparing his expert report, he knew that Jason Crigler was Judge Crigler's son and that Judge Crigler was assigned to this case. (*Id.* at 122). d'Oronzio explained that he and Jason Crigler have known each other for three years and that they served together on the board of directors of the Central Virginia Mortgage Professionals. (*Id.* at 122-23). According to d'Oronzio, he and Jason Crigler were only "casual business acquaintances" who did not see each other socially, yet d'Oronzio sought Mr. Crigler's assistance out of all other mortgage professionals whom he could contact in the area. (*Id.* at 123). d'Oronzio further admitted that Crown Mortgage, a mortgage company owned by Jason Crigler and located in Charlottesville may have been a competitor of GMAC at the time the Loan was originated and that it primarily dealt in Freddie Mac loans, such as the Loan at issue here. (*Id.* at 125-26).

d'Oronzio's contact with Jason Crigler is improper for several reasons and requires exclusion of d'Oronzio's expert testimony at trial. First, d'Oronzio's apparent attempt to bolster his credibility in front of the jury by relying on the mortgage data provided by the Judge's son is unfair and inappropriate. d'Oronzio's reliance on such data has substantial likelihood of prejudicing the jury against GMAC by creating an unfair association between the Judge's son and Plaintiffs as being on the "right side" of the dispute and GMAC as being on the "wrong side."

Second, even if d'Oronzio does not volunteer this information during his testimony at trial, GMAC's counsel must cross-examine d'Oronzio about the sources and bases for his expert opinion, which will inevitably bring to light his reliance on Jason Crigler's historic interest rate sheets. As an advocate for its client, GMAC's counsel must be permitted to zealously represent its client's interests, and the rate sheets here are the basis for the issue of paramount importance – expert's calculation of Plaintiffs' damages. Based on these rate sheets d'Oronzio concluded that GMAC provided Plaintiffs with an above-market interest rate and, consequently, d'Oronzio based his damages calculation on the difference between Plaintiffs' current interest rate and the historic interest rate shown on the rate sheets. GMAC's counsel must test the Plaintiffs' adverse witness' determination of damages and his bases therefore. Accordingly, because d'Oronzio's deliberate and improper contact with Jason Crigler will substantially prejudice GMAC at trial and because this prejudice cannot be avoided, d'Oronzio should be precluded from testifying in this case.

  **B.**  **<u>d'Oronzio Was Biased against Karen Morris before Plaintiffs Retained His Opinion against GMAC</u>**.

"A district judge acts as a "gatekeeper" in determining whether an expert's purported testimony is reliable. Reliable expert testimony cannot be based on mere belief or

speculation; rather, it must be based on scientific, technical, or, in this case, specialized knowledge derived from valid methods." *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn*, 98 F. Supp. 2d 729, 736 (W.D. Va. 2000) (disqualifying expert witness because he lacked the necessary qualifications, his methodology was unreliable, and his close work with the party that hired him created a potential for bias). *Id.* "It is imperative for expert witnesses to be independent." *Id.* While potential for bias can usually be checked by comparing the expert witness' testimony with his prior work, testimony, and reputation, such checks are absent when the expert witness lacks scholarly work and has not testified before, thus increasing the danger of the expert witness' bias being undetected. *See id.*

Here, d'Oronzio began this case with a personal negative opinion about Karen Morris (the loan officer), which he clearly expressed during his deposition. (d'Oronzio Dep. at 51-59). In particular, d'Oronzio testified that prior to being retained as an expert witness he had already formed an understanding about Karen Morris' reputation within the mortgage industry community as being "unscrupulous," "difficult," and "opportunistic." (*Id.* at 58-59). According to d'Oronzio, even though he did not have personal experience with Karen Morris, "it is very rare that a uniform opinion in a small town is wrong." (*Id.* at 57). Burdened with this "baggage," d'Oronzio prepared his expert reports, which are replete with negative inferences about Karen Moris' intentions, actions, disclosures, and lack thereof. (Initial Expert Report at ¶¶ 7, 10, attached as Exhibit 3 hereto; Suppl. Expert Report at ¶¶ 8(b)&(c), 10, 11, 12). Instead of using valid principles and methods accepted in the mortgage industry, d'Oronzio relies on his subjective beliefs and conversations with Plaintiffs to ascribe to Karen Morris intent to deceive Plaintiffs, conceal LPMI, and unfairly profit from the origination of the Plaintiffs' loan. (*Id.*) However, d'Oronzio admits he has no knowledge of or experience with the software programs

5

(LoanSoft and Pilot) used at GMAC to generate the loan documents.  (d'Oronzio Dep. at 198-200).

Therefore, d'Oronzio's opinions in this case are impermissibly based on subjective beliefs, rather than on expertise as required by the Federal Rule of Evidence 702 and the *Daubert* standard.  d'Oronzio has not testified as an expert witness in any other case, his independence in rendering his expert opinion cannot be checked and, as this Court held in *Virginia Vermiculite, Ltd.,* this absence of checks should be a factor in deciding whether to exclude the expert witness because of his bias.  Accordingly, the Court should exclude d'Oronzio as an expert witness in this case.

### C. d'Oronzio Is Not Qualified to Render His Purported Expert Opinion.

An expert may state an opinion or conclusion if the subject matter is appropriate, the witness is qualified, the witness possesses a reasonable probability regarding the opinion, the opinion has a proper factual basis, and the information used to form that basis of the opinion is the type reasonably relied upon by experts in the particular field.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).  Fed. R. Evid. 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, *a witness qualified as an expert by knowledge, skill, experience, training, or education*, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.  (emphasis added).

*Daubert* and Fed. R. Evid. 702 require the court to exercise its discretion and act as a "gate keeper," until it is satisfied that the proffered expert scientific testimony meets certain standards of reliability.  *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199-200 (4th Cir. 2001). An essential part of the court's gate keeping function is to ensure that the expert

6

testimony is more than mere speculation. *Daubert*, 509 U.S. at 590. Only relevant, reliable testimony that is based on scientific knowledge should be admitted. *Id.* As discussed below, even if the Court does not exclude d'Oronzio as an expert witness because of his improper contact with Jason Crigler and his speculative and inappropriate conclusions tainted by his bias against Karen Morris, d'Oronzio's testimony should be excluded because he is not qualified as an expert in the field of mortgage lending or damages under well established law.

### 1. d'Oronzio Is Not Qualified to Testify about Damages or to Use the Annuities Method of Damages Calculation.

d'Oronzio has never served as an expert witness in any case before. (d'Oronzio Dep. at 22). As exemplified by his deposition, d'Oronzio is in the business of brokering loans, which is 90% of his work. (*Id.* at 15-16). He is "engaged on the wholesale side," as opposed to dealing with "loans originated at the retailer." (*Id.* at 41, 44). d'Oronzio has no experience in retail mortgage lending and has no basis to comment about GMAC's lending practices.

d'Oronzio holds bachelor's and master's degrees in History. (d'Oronzio Dep. at 67). Other than studying "economic history," he did not take any coursework in mathematics, finance, or economics and does not claim to be an expert in either. (*Id.* at 67-68). d'Oronzio's damages calculations are based on his "basic grasp" of mathematics and on the use of online calculators. (*Id.* at 68-69, 176-77). To discount the future damages to their present value, d'Oronzio has "surveyed annuity returns and rates of returns for annuities," experimented with two or three online calculators, "found one that was relatively simple … and ran the calculations that way." (*Id.* at 175-76). Such damages calculations should be excluded because they are not based on reliable principles and methods.

An expert's qualification "underpins all of the [*Daubert*] factors." *Hartwell v. Dantek Med., Inc.*, 47 F. Supp. 2d 703, 715 (W.D. Va. 1999). An expert witness must be

qualified, "by knowledge, skill, experience, training, or education." Fed R. Evid. 702, *see also Hartwell*, 47 F. Supp. 2d at 715; *Dreyer v. Ryder Automotive Carrier Group, Inc.*, 367 F. Supp. 2d 413, 426 (W.D.N.Y. 2005) (noting that, in order to qualify as an expert, the witness "[f]irst … must be shown to qualify as an expert by virtue of 'knowledge, skill, experience, training, or education'"). Further, the information used to form the basis of the expert opinion must be the type reasonably relied upon by experts in the particular field and is the product of reliable principles and methods. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). An expert's testimony is admissible only if his methodology or reasoning is scientifically valid. *Id*. ("the reasoning or methodology underlying the expert's proffered opinion [must be] . . . supported by adequate validation"); *Cavallo v. Star Enterprise*, 100 F.3d 1150, 1158 (4th Cir. 1996) (expert testimony admissibility is controlled by "whether the reasoning or methodology underlying the testimony is scientifically valid").

As described above, d'Oronzio is not qualified by knowledge, skill, experience, or education to proffer testimony on or calculate damages. Neither does d'Oronzio's education in history nor does his professional experience in brokering loans qualifies him as an expert in damages. Further, d'Oronzio's method of discounting future damages to their present value is unsupported by any evidence that it is a valid scientific methodology used in the mortgage industry. Even if the use of annuities is an accepted and valid methodology, d'Oronzio has no skill, education, or experience to apply it and the assistance of an online calculator is not the kind of reliable scientific evidence contemplated by the *Daubert* standard. Therefore, d'Oronzio's damages calculations should be excluded and he should be precluded from testifying about Plaintiffs' damages at trial.

### 2. d'Oronzio's Method of Calculating Damages Is Speculative and Without Scientific Basis.

d'Oronzio's calculation of damages is based on unwarranted assumptions and conjectures about events that may or may not take place in the next 27 years. Such methodology is inherently unreliable and speculative and should not form the basis for the expert opinion. In his Initial Expert Report, d'Oronzio arrives at $166,778.00 damages figure by calculating how much Plaintiffs would pay over the life of the loan – or 27 years – and deducting from this figure how much Plaintiffs would pay over the life of the loan if they were able to refinance at 4.5% interest rate under the Freddie Mac Refinance Relief Assistance program. (Initial Expert Report at ¶ 11). Such calculations are problematic for several reasons.

First, they presume that Plaintiffs would either not be able to refinance with any lender or that they would choose not to refinance. Not only are these scenarios conjectural but they are also contrary to the facts. Neither Plaintiffs nor d'Oronzio have any evidence that Plaintiffs will not be able to refinance. Market conditions change and the currently depressed value of the Plaintiffs' property is likely to go back up, which will make it easier for Plaintiffs to refinance in the future. That Plaintiffs will take advantage of this opportunity is clear from their consistent pattern of repeatedly cashing out on the equity in their residence to finance their spending habits.[2] d'Oronzio's multiplication of damages over the entire life of the loan is simply too speculative to form reliable basis for his expert opinion. *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn*, 98 F. Supp. 2d 729, 736 (W.D. Va. 2000) ("Reliable expert testimony

---

[2] GMAC incorporates by reference here its arguments for summary judgment on Plaintiffs' claims for actual damages in this case. Plaintiffs have not and cannot meet their burden of proving that damages were proximately caused by GMAC and Plaintiffs cannot meet that burden by speculations from a purported expert witness.

cannot be based on mere belief or speculation"). This is an additional independent reason why d'Oronzio should be excluded as an expert at least on the issue of damages.

### D. d'Oronzio Impermissibly Draws Legal Conclusions about Issues in Which He Has No Expertise.

In his expert reports and during the deposition, d'Oronzio stated several times that GMAC "intentionally" and "deliberately" concealed LPMI from Plaintiffs. (Initial Expert Report at ¶ 7; Suppl. Expert Report at ¶ 8(b); d'Oronzio Dep. at 194-96). In particular, in his Initial Expert Report d'Oronzio concludes that GMAC "intentionally misled the Scotts regarding the need for and existence of lender paid mortgage insurance burdening the subject loan." (Initial Expert Report at ¶ 7). In reference to the two loan commitments one of which contained reference to the LPMI and the other did not, d'Oronzio opines that "it is difficult to conceive of any scenario involving the generation of these two documents that does not involve a deliberate attempt to deceive the Scotts … ." (*Id.*) In his Supplemental Report, d'Oronzio repeats "No reasonable explanation other than to deceive comes to my mind." (Suppl. Expert Report at ¶ 8(b)). These statements constitute improper legal conclusions and are contrary to the facts and d'Oronzio's own admissions during the deposition, as explained in greater detail below.

#### 1. d'Oronzio's Legal Conclusions Are Improper and Should Be Excluded.

d'Oronzio attended the University of Virginia Law School (d'Oronzio Dep. at 69-70) and likely knows or was told that a necessary element of a fraud claim is **intentional** misrepresentation. Ultimate questions of fact are proper subject for opinion testimony (Fed. R. Evid. 702), but "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *See United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002) (excluding expert testimony ); *see also United States v Windfelder*, 790 F.2d

576 (7th Cir. 1986) (finding it was error to admit expert testimony that defendant intentionally understated his income since these statements impermissibly stated opinion as to defendant's knowledge or willfulness which constituted element of crimes charged).  Likewise here, this Court and the jury do not need the testimony of d'Oronzio to determine a legal question of fraud. d'Oronzio's deliberate attempts to draw legal conclusions based on the facts of the case are improper and should be disallowed.

> 2. **d'Oronzio Is Not Qualified to Opine about Intentionality of Supposed Deletions in Plaintiffs' Loan Documents.**

Although in his expert reports d'Oronzio insists that there is no reasonable explanation for the omission of an LPMI reference in the Loan Commitment other than intentional and deliberate intent to deceive, d'Oronzio admitted during his deposition that has not seen and never used the GMAC software that generates loan documents and that the omission could have happened for a variety of other reasons, including a software glitch.  The following portion of d'Oronzio's deposition clearly reflects inconsistency in d'Oronzio's opinion that a mortgage insurance disclosure was deliberately deleted from the Mortgage Loan Commitment and his simultaneous admission that such deletion could have been a function of the software malfunction:

> **A.   My conclusion is that that final loan commitment had a required paragraph absent, and would have to assume removed, from that document that actively concealed the presence of lender-paid mortgage insurance on it …**
> … Q.   Okay.  So are you assuming that it was a deliberate removal?
> **… A. I am having a very difficult time conceiving of another scenario other than deliberate removal.**

(d'Oronzio Dep. at 195).

> Q.   You don't know what programs were used to generate the interest rate lock agreement or the mortgage loan commitment?

11

> **A. I do not know, although they have been referenced in the documents at various places in the declarations. There's the Pilot program … but I'm not familiar with the ins and outs of how their specific programs work. So I admit I am confused as to why this interest rate lock option financing agreement has "LPMI conforming FNMA" on it, yet the one faxed to the closing table conveniently is identical except that the rate is an eighth lower and that is gone. I don't know why that is -- why it is. I don't know why that happened.**
> Q. And that's because you're not familiar with the software programs that they use?
> **A. … I was not there. I did not stand over somebody. I am not familiar with the programs. So there are a variety of reasons why I do not know exactly what happened, but I am willing to make assumptions about what is most likely.**

(*Id.* at 198-99).

> Q. You don't purport to be an expert on loan generation or loan program software?
> **A. I do not.**
> Q. And you'd agree that you're not familiar with the Pilot program that was purportedly used to generate documents in this loan?
> **A. Yeah, despite the serendipity of the name.**
> Q. So you're not familiar with it?
> **A. That is correct.**
> Q. You don't use it yourself?
> **A. I do not.**
> Q. Have you ever had access to it?
> **A. I have not.**
> …Q. So it's fair to say that you have no personal knowledge of the Pilot program?
> **A. That is correct.**
> Q. And you have no personal knowledge of the Loansoft program?
> **A. I do not.**

(*Id.* at 199-200).

By contrast, GMAC's employees and its corporate representative are very familiar with GMAC's software, including the Pilot and LoanSoft programs. During their depositions, Karen Morris and GMAC's corporate representative Susan Young explained that

12

mortgage loan commitments and other loan documents used at closing are automatically populated in the Pilot program and that GMAC's employees have no ability, access, or authority to alter these loan documents. (Morris Dep. at 79-81, attached as Exhibit 4 hereto; Young Dep. at 71-73, attached as Exhibit 5 hereto) For example, Karen Morris explained during her deposition that after she inputs the borrower's information into the LoanSoft program, it is automatically exported into the Pilot program for use in closing the loan. (Moris Dep. at 79-80). Karen Morris, or any other loan originator, do not have the ability to alter any information in the Pilot and can access it "in a viewer-only capacity." (*Id*. at 80).

In addition to confirming Morris' testimony that a loan originator could not change any language in the mortgage loan commitment, Susan Young explained why the LPMI reference in the Interest Lock Option Financing Agreement was not included in the closing document. (Young Dep. at 64-66; 71-73). The original document was originated in the LoanSoft program. (*Id.* at 65). The interest rate changed from the time of application to closing (it improved), and closing documents with the lower interest rate were printed from the Pilot program that does not have the loan product field mapped to LoanSoft (the program did not populate that information). (*Id.*) The product field in the final Interest Rate Lock Option Financing Agreement signed at closing was blank. It was omitted by the computer program. (*Id.* at 71-73).

The computer program accounts for the omission and d'Oronzio admits he knows nothing about such matters. d'Oronzio's improper legal conclusions ascribing fraudulent intent to GMAC and its employees are unfounded and should be excluded.

13

E. **Plaintiffs Prejudiced GMAC by Late Production of d'Oronzio's Expert Report.**

Pursuant to Fed. R. Civ. P. 26(a)(2)(B), an expert witness must submit his written report in accordance with the court's scheduling order. "Every litigant in federal court is plainly entitled under Rule 26(a)(2)(B) to be given the information spelled out therein, and none shoulder the burden to independently investigate and ferret out that information as best they can and at the expense of their client." *Carr v. Deeds*, 453 F.3d 593, 605 (4th Cir. 2006). "The available penalty for failure to comply with Rule 26(a)(2)(B) is equally plain, and if a litigant refuses to comply with the requirements of the rule, he does so at his peril." *Id*. (citing *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 274 (4th Cir. 2005) (noting that "[l]itigants who fail to comply with court scheduling and discovery orders should not expect courts of appeal to save them from the consequences of their own delinquence.")).

Here, the deadline for all written discovery was January 18, 2011. (Pretrial Order, Docket No. 10). Notwithstanding this deadline, Plaintiffs' expert served his Supplement to the Initial Expert Report almost one month later, on February 14, 2011. Not only was this supplementation untimely under the Pretrial Order, it was particularly prejudicial because it was filed just one day before d'Oronzio's deposition on February 15, 2011, thus leaving GMAC without the opportunity to adequately prepare for the deposition. Any delay in conducting d'Oronzio's deposition was not possible either because the deposition deadline was just three days later, on February 18, 2010, and GMAC's counsel had the depositions of Karen Morris and Susan Young already scheduled on February 16 and 18, respectively. Plaintiffs did not seek relief from this Court to extend the expert disclosure deadlines even though they could have done so when the parties agreed to extend certain other pretrial deadlines on January 24, 2011. (Docket No. 58). Therefore, d'Oronzio's Supplement to the Initial Expert Report must be

14

stricken[3] or, at the very least, GMAC should be granted leave to file a supplemental report by its own expert witness. *See Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 278-279 (4th Cir. 2005) (affirming exclusion of experts and noting the appropriateness of exclusion as a sanction for the failure to timely file Rule 26 expert disclosures).

### F. d'Oronzio Failed to Timely Disclose All Bases for His Purported Expert Opinion.

Further, d'Oronzio failed to disclose to GMAC all bases for the opinions stated in his initial expert report and supplement thereto. Under Fed. R. Civ. P. 26(a), an expert "report must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources." *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998) (citing *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995)).

At the deposition, d'Oronzio produced a series of documents that had not been presented to GMAC's counsel before. (d'Oronzio Dep. at 106-107). Further, d'Oronzio indicated that he had more documents and communications that he did not produce to GMAC. (*Id.* at 108-110). These additional documents were produced to GMAC on March 2, only after GMAC's counsel sent a letter to Plaintiffs' counsel requesting the same. d'Oronzio's failure to timely provide GMAC with all the bases for his expert opinion is inexcusable and has hindered GMAC's ability to prepare for the deposition and for trial. Therefore, d'Oronzio's Initial Expert Report and Supplement thereto should be stricken.

---

[3] During d'Oronzio's deposition, GMAC's counsel has objected to the late production of d'Oronzio's Supplement and reserved GMAC's right to request that the Supplement be stricken. (d'Oronzio Dep. at 100).

15

### III. CONCLUSION

For all the reasons discussed above, Defendant GMAC respectfully requests that the Court grant its motion to exclude Phil d'Oronzio as an expert witness, to strike Phil d'Oronzio's expert reports, and granting GMAC any other legal or equitable relief the Court deems appropriate.

          **GMAC MORTGAGE, LLC**

          By:   /s/ Jason E. Manning
                 Of Counsel

John C. Lynch (VSB No. 39267)
Jason E. Manning (VSB No. 74306)
*Counsel for Defendant GMAC Mortgage, LLC*
TROUTMAN SANDERS LLP
222 Central Park Ave., Suite 2000
Virginia Beach, VA 23462
Telephone: (757) 687-7500
Facsimile: (757) 687-7510
E-mail: john.lynch@troutmansanders.com
E-mail: jason.manning@troutmansanders.com

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

DONALD R. SCOTT and
MELISSA J. SCOTT,

    Plaintiffs,

    v.                                Civil Action No. 3:10-cv-24

GMAC MORTGAGE, LLC,

    Defendant.

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of March, 2011, I electronically filed the foregoing with the clerk of the Court using the CM/ECF system that will send a true and correct copy of the foregoing to the following counsel of record:

**Counsel for Plaintiffs**
Jonathan Wren
John Simpson
Martin Wren, P.C.
1228 Cedars Court
Charlottesville, Virginia 22903

      /s/ Jason E. Manning
John C. Lynch (VSB No. 39267)
Jason E. Manning (VSB No. 74306)
*Counsel for Defendant GMAC Mortgage, LLC*
TROUTMAN SANDERS LLP
222 Central Park Ave., Suite 2000
Virginia Beach, VA 23462
Telephone: (757) 687-7500
Facsimile: (757) 687-7510
E-mail: john.lynch@troutmansanders.com
E-mail: jason.manning@troutmansanders.com

414218v1